UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| THE CLEANING AUTHORITY FRANCHISING SPE LLC, | * |
| | * |
|     Plaintiff, | * |
| | * |
| v. | *    Civil Action No. EA-24-147 |
| | * |
| MIKE CAVALLARO, | * |
| | * |
|     Defendant. | * |
| | * |

**MEMORANDUM OPINION**

Plaintiff The Cleaning Authority Franchising SPE LLC (The Cleaning Authority) initiated the above-captioned action on January 16, 2024, alleging breach of contract, trademark infringement, and unfair competition claims based on Defendant Mike Cavallaro's alleged breach of a franchise agreement. ECF No. 1. The Cleaning Authority seeks injunctive, monetary, and other relief. *Id.* Mr. Cavallaro filed an Answer in which he asserted counterclaims seeking a declaratory judgment and alleging breach of contract. ECF No. 13. Pending before the Court is The Cleaning Authority's motion for partial summary judgment. ECF No. 39. The motion has been fully briefed, and no hearing is necessary. ECF Nos. 39, 42–43; Local Rule 105.6 (D. Md. 2023). For the reasons set forth below, the motion is granted in part and denied in part.

**I.  BACKGROUND**

The Cleaning Authority's Complaint pleads four counts. ECF No. 1. Counts I and II allege breach of contract based on alleged conduct before and after termination of the franchise agreement; Count III alleges trademark infringement in violation of Section 32 of the Lanham Act, 15 U.S.C. § 1114; and Count IV alleges unfair competition. *Id.* at ¶¶ 47–63. In his Answer, Mr. Cavallaro pleads two counterclaims. ECF No. 13. In Count I, Mr. Cavallaro seeks

declaratory judgments finding that The Cleaning Authority materially breached the franchise agreements and discharging him from his contractual duties due to impossibility, impracticability of performance, frustration of purpose, unconscionability, and fraud. *Id.* at ¶¶ 128–158. In Count II, Mr. Cavallaro alleges breach of contract by The Cleaning Authority. *Id.* at ¶¶ 159–166. The Cleaning Authority moves for summary judgment on its breach of contract claims (Counts I and II), as well Mr. Cavallaro's two counterclaims.[1] ECF No. 39.

### A.     The Cleaning Authority's Breach of Contract Claims

Mr. Cavallaro first became a franchisee with The Cleaning Authority in 2002. ECF No. 39-4 at 13:6–15.[2] Mr. Cavallaro continued to operate the business after the 2002 franchise agreement had expired, which resulted in The Cleaning Authority filing suit against Mr. Cavallaro for breaching his obligation to pay royalties and the noncompetition agreement of the 2002 agreement. *Id.* at 20:8–23:1. The parties renewed the franchise agreement in 2012 to resolve this dispute. *Id.* at 22:22–23:1, 23:6–13.

On February 25, 2017, Mr. Cavallaro and The Cleaning Authority entered the franchise agreement at issue in this action, which was effective for a 10-year term, as amended. ECF No. 39-3 at 2, 9, 38, 52–54. The agreement granted Mr. Cavallaro the right to own and operate a The Cleaning Authority franchise and use marks within 26 zip codes in Pennsylvania, *i.e.*, the Territory. *Id.* at 41; *see also id.* at 9 (defining "Territory"). In exchange, Mr. Cavallaro agreed to, among other things, pay an initial fee and territory fee, as well as royalty fees between four

---

[1] The Cleaning Authority indicates that "in order to permit efficient resolution of the case, [it] is prepared to dismiss the remaining claims for trademark infringement and federal unfair competition if summary judgment is granted." ECF No. 39-1 at 7 n.1.

[2] Page numbers refer to the pagination of the Court's Case Management/Electronic Case Files system (CM/ECF) printed at the top of the cited document, except that page numbers of exhibits that are deposition transcripts refer to the page and line number of the deposition transcript.

and six percent and an advertising fee of one percent of the franchise's gross revenue. *Id.* at 12–14, 53. Mr. Cavallaro also agreed to participate in The Cleaning Authority's Mailer Program, for which he was required to pay for the production and delivery of advertising mailers to "Designated Households" in the Territory in accordance with the quotas and requirements set forth in the franchise agreement. *Id.* at 13–14, 44–46, 53; *see also id.* at 7 (defining "Designated Households"). Mr. Cavallaro agreed to authorize The Cleaning Authority to withdraw these and other charges weekly from his bank account via electronic funds transfer. *Id.* at 12. The agreement was subject to termination without an opportunity to cure if, among other things, on three or more occasions in a twelve-month period, Mr. Cavallaro's bank refused an electronic funds transfer request to pay The Cleaning Authority the amounts due. *Id.* at 24. Mr. Cavallaro, under a personal guaranty, agreed to be bound by the provisions in the agreement. *Id.* at 39–40. Mr. Cavallaro also agreed to a confidentiality and noncompetition agreement prohibiting the use of The Cleaning Authority's marks and activities causing damage to The Cleaning Authority's goodwill for 24 months after ceasing to hold a position as franchisee. *Id.* at 30–31, 47–51; *see also id.* at 22–23 (addressing "The Marks" (all caps removed)), 30–31 (addressing "Covenant Not to Compete and Confidentiality" (all caps removed)).

In September 2023, Mr. Cavallaro removed The Cleaning Authority's access to withdraw funds from his bank account and never reestablished payment. ECF No. 39-4 at 35:12–14, 43:8–13. On October 5, 2023, The Cleaning Authority sent Mr. Cavallaro a notice of default for failure to make required payments to The Cleaning Authority and a final opportunity to cure. ECF Nos. 39-4 at 68:11–22; 39-6. After the time to cure elapsed, The Cleaning Authority sent a notice of termination, effective October 20, 2023. ECF Nos. 39-4 at 68:23–69:3; 39-7. Termination of the franchise agreement triggered a post-termination noncompetition agreement. ECF No. 39-3 at 20–21, 30–31, 47–51; *see also id.* at 22–23 (addressing "The Marks") (all caps

3

removed), 30–31 (addressing "Covenant Not to Compete and Confidentiality") (all caps removed). Mr. Cavallaro, through counsel, corresponded with The Cleaning Authority in September through October 2023 and remitted payments for royalties and advertising. ECF No. 42-8. This correspondence reflects the parties' differing views as to the amounts Mr. Cavallaro owed The Cleaning Authority. *Id.* at 8 ("The math is wrong."), 13 (stating "[m]y client is confused by the $7,063.45 number that is included in your letter"; identifying the total amount of advertising fees due as $6,021.17; and asserting that "[i]t is our understanding that all other payments for royalties, software, and call center have been paid"). In this correspondence, Mr. Cavallaro also offered to renew his electronic payments. *Id.* at 14.

During his deposition, Mr. Cavallaro acknowledged that he understood that he had to comply with the post-termination obligations of the franchise agreement. ECF No. 39-4 at 69:4–11, 70:1–3. Yet, in October 2023, Mr. Cavallaro formed and operated a cleaning business, Hygienitech HCS, in the same area as his previous The Cleaning Authority territory despite the franchise agreement's noncompetition clause. *Id.* at 69:4–21, 73:12–17, 130:13–131:1. Hygienitech HCS continued its services and sent emails offering its services to The Cleaning Authority customers (*id.* at 73:16–74:6, 101:13–15), and retained some The Cleaning Authority employees (*id.* at 105:11–14, 106:14–16). On November 1, 2023, The Cleaning Authority sent Mr. Cavallaro a notice to cease and desist and comply with post-termination obligations, including ceasing all communications with The Cleaning Authority customers and producing all customer agreements. ECF No. 39-10. Mr. Cavallaro failed to comply and continued to operate his new business. ECF No. 39-4 at 101:8–102:23.

### B. Mr. Cavallaro's Counterclaims

The Cleaning Authority agreed to provide Mr. Cavallaro with "reasonable operating assistance, as [The Cleaning Authority] determine[s] from time to time to be necessary for the

4

operation of the Franchised Business" as part of the franchise agreement. ECF No. 39-3 at 20. Between May and December 2021, Mr. Cavallaro emailed with The Cleaning Authority employees regarding his difficulty with hiring and maintaining a full staff. ECF Nos. 42-1, 42-2, 42-4. In these communications, Mr. Cavallaro highlighted the difficulty with advertising for new business in the face of staffing challenges. *E.g.*, ECF No. 42-1 at 3 ("I believe it would be in [T]he Cleaning Authorit[y's] and my best interest to stop all advertising. I cannot clean the schedule I have, I have seven customers waiting to get on the schedule, I have another seven that I have not even put in, and I have about 18 estimates scheduled over the next two weeks."); ECF No. 42-4 at 2 ("With 40 customers on a wait list, some for 3 or more months all we do is exasperate the problem by continuing to advertise for a service we cannot provide."). The Cleaning Authority made suggestions about various hiring strategies. ECF Nos. 42-1 at 3; 42-2 at 2–4; 42-3 at 2–4; 42-6 at 2–4. In April 2023, Mr. Cavallaro "formally ask[ed] [The Cleaning Authority] to freeze all advertising immediately" due to staffing issues. ECF No. 42-5 at 2.

In his deposition, Mr. Cavallaro acknowledged that neither his attorney nor anyone else ever claimed that The Cleaning Authority breached the terms of the franchise agreement or that the agreement was unconscionable. ECF No. 39-4 at 86:1–10. Indeed, Mr. Cavallaro could not point to any specific provision of the franchise agreement that he believed The Cleaning Authority had breached. *Id.* at 154:20–155:20. Instead, Mr. Cavallaro asserted that he did not "think they gave [him] the support that [he] needed when [he] needed it." *Id.* at 154:24–25. He further asserted that "it became apparent to [him] that [T]he Cleaning Authority was not conducive to [his] success in the cleaning business because they continued to make [him] advertise for customers that [he] could not service and continue to pay for advertising that was not doing [him] any good." *Id.* at 154:4–9. In Mr. Cavallaro's view, The Cleaning Authority

5

was "not interested in [his] success as a franchise," but was "more interested in [him] being a customer and paying for advertising whether [he] needed it or not." *Id.* at 154:12–15.

## II.   DISCUSSION

The Cleaning Authority moves for summary judgment on its two breach of contract claims, arguing that Mr. "Cavallaro's deposition testimony, coupled with the undisputed language of the Franchise Agreement, establishes [The Cleaning Authority]'s entitlement to judgment on its claims for pre-termination (Count I) and post-termination (Count II) breaches of contract as a matter of law." ECF No. 39-1 at 7. The Cleaning Authority further contends that Mr. Cavallaro's tenure as a franchisee and failure to identify a specific breach of the franchise agreement are fatal to his counterclaims. *Id.* Mr. Cavallaro argues that The Cleaning Authority's alleged breach of contract excused his performance and that there is a genuine dispute of material fact regarding his ability to perform under the agreement, all of which preclude summary judgment. ECF No. 42 at 4. Among other things, Mr. Cavallaro contends that the "fact finder must weigh the [ ] negative impact of the [Coronavirus Disease 2019 (COVID 19)] shutdown on in-home service businesses such as [Mr. Cavallaro's]." *Id.* at 11.

### A.   Standard of Review

Summary judgment motion practice "is properly regarded . . . as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1). Federal Rule of Civil Procedure 56 provides that the district court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the

6

requirement is that there be no *genuine* issue of *material* fact." *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 247-248 (1986) (emphasis in original).  A material fact is one that "might affect the outcome of the suit under the governing law." *Id.* at 248.  A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

Thus, to defeat summary judgment, "all that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *First Nat. Bank of Ariz.* v. *Cities Serv. Co.*, 391 U.S. 253, 288-289 (1968).  On the other hand, summary judgment "is justified if, from the totality of the evidence presented, including pleadings, depositions, answers to interrogatories, and affidavits, the court is satisfied that there is no genuine factual issue for trial and the moving party is entitled to judgment as a matter of law." *Sylvia Dev. Corp.* v. *Calvert Cnty., Md.*, 48 F.3d 810, 817 (4th Cir. 1995).

The Fourth Circuit Court of Appeals has cautioned that summary judgment "cannot be granted merely because the court believes that the movant will prevail if the action is tried on the merits." *Jacobs* v. *N.C. Admin. Off. of the Cts.*, 780 F.3d 562, 568-569 (4th Cir. 2015) (quoting 10A CHARLES ALAN WRIGHT & ARTHUR R. MILLER ET AL., FEDERAL PRACTICE AND PROCEDURE § 2728 (3d ed. 1998)).  At this stage, "the judge's function is not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.  In doing so, the district court "must view the evidence in the light most favorable to . . . the nonmovant and draw all reasonable inferences in [its] favor without weighing the evidence or assessing the witnesses' credibility." *Baynard* v. *Malone*, 268 F.3d 228, 234-235 (4th Cir. 2001).  To survive summary judgment, the nonmoving party must provide evidence, "not unsupported conjecture." *Graves* v. *Lioi*, 930 F.3d 307, 324 (4th Cir. 2019).

Thus, "[h]earsay statements or conclusory statements with no evidentiary basis cannot support or defeat a motion for summary judgment." *Alston* v. *Astrue*, Civil Action No. L-10-3446, 2012 WL 665982, at *4 (D. Md. Feb. 28, 2012), *aff'd*, 474 Fed. Appx. 390 (4th Cir. 2012).

### B.     Breach of Contract

The Court is to apply the substantive law of the state in which it sits when adjudicating claims brought under a federal court's diversity jurisdiction. *Mathis* v. *Terra Renewal Serv. Inc.*, 69 F.4th 236, 242 (4th Cir. 2023); *Lewis* v. *Waletzky*, 422 Md. 647, 657 (2011). When analyzing contract claims, Maryland applies the law of the jurisdiction where the contract was made unless the contract contains a choice of law provision. *Cunningham* v. *Feinberg*, 441 Md. 310, 326 (2015) (collecting cases). Here, both parties agreed that the franchise agreement and their relationship is governed by Maryland law. ECF No. 39-3 at 33.

A breach of contract is a "failure, without legal excuse, to perform any promise that forms the whole or part of a contract." *Weaver* v. *ZeniMax Media, Inc.*, 175 Md. App. 16, 51 (2007) (citing 23 Richard A. Lord, WILLISTON ON CONTRACTS § 63:1 (4th ed. Supp. 2006)). The elements of a breach of contract claim under Maryland law are (1) a contractual obligation and (2) material breach of that obligation.[3] *RRC Ne., LLC* v. *BAA Md., Inc.*, 413 Md. 638, 658 (2010); *Taylor* v. *NationsBank, N.A.*, 365 Md. 166, 175 (2001). Ultimately, it is "the parties' agreement that . . . determines whether there has been a breach." *Mathis* v. *Hargrove*, 166 Md. App. 286, 318-319 (2005). Thus, understanding the contract's terms is key to determining whether the contract has been breached.

---

[3] "It is not necessary that the plaintiff prove damages resulting from the breach, for it is well settled that where a breach of contract occurs, one may recover nominal damages even though he has failed to prove actual damages." *Taylor* v. *NationsBank, N.A.*, 365 Md. 166, 175 (2001); *Hooton* v. *Kenneth B. Mumaw Plumbing & Heating Co., Inc,*, 271 Md. 565, 572 (1974).

"Maryland follows the objective law of contract interpretation and construction." *Taylor*, 365 Md. at 178. This interpretive principle provides that "where the language employed in a contract is unambiguous, a court shall give effect to its plain meaning and there is no need for further construction" or use of extrinsic evidence. *Wells* v. *Chevy Chase Bank, F.S.B.*, 363 Md. 232, 251 (2001); *see also Clendenin Bros., Inc.,* v. *United States Fire Ins. Co.*, 390 Md. 449, 459 (2006). A contract's "plain meaning is determined by 'focus[ing] on the four corners of the agreement,'" not what the parties may have subjectively intended. *Martz* v. *Day Dev. Co., L.C.*, 35 F.4th 220, 225 (4th Cir. 2022) (quoting *Cochran* v. *Norkunas*, 398 Md. 1, 17 (2007)) (alteration in original). When the contract language is "plain and unambiguous," the Court must "determine from the language of the agreement itself what a reasonable person in the position of the parties would have meant at the time it was effectuated." *Taylor*, 365 Md. at 178-179.

        1.        The Cleaning Authority's Counts I and II

The Cleaning Authority asserts two breach of contract claims based on (1) Mr. Cavallaro's obligations to pay royalties and other fees and (2) the confidentiality and noncompetition agreement, each of which is addressed in turn below. ECF No. 1 ¶¶ 47–55.

Mr. Cavallaro agreed to pay certain fees to The Cleaning Authority in exchange for the right to operate the franchise, including a royalty fee between four and six percent of the franchise's gross revenue, and to authorize The Cleaning Authority to withdraw these and related charges weekly from his bank account via electronic funds transfer. ECF No. 39-3 at 12. In September 2023, Mr. Cavallaro removed The Cleaning Authority's access to withdraw funds from his bank account in violation of the agreement and failed to reestablish access and make payments until the termination of the franchise agreement on October 20, 2023. ECF Nos. 39-4 at 35:10–43:13, 68:23–69:3; 39-7. Mr. Cavallaro testified at his deposition that he "shut off [his] bank account to [T]he Cleaning Authority's access to it"; that he understood that this was a

9

violation of the franchise agreement; and that he "never reestablished [his] bank accounts to facilitate electronic payments as required." ECF No. 39-4 at 35:10–17, 43:8–13. Mr. Cavallaro admitted that he had received both the notice of default and the notice of termination. ECF No. 39-5 ¶¶ 5, 8.

Mr. Cavallaro also agreed to not engage in any cleaning business within 20 miles of his franchise territory for a period of 24 months after ceasing to hold a position as franchisee. ECF No. 39-3 at 49. Following termination of the franchise agreement, in October 2023, Mr. Cavallaro began to operate a cleaning business, Hygienitech HCS, using the same business address and some of the same staff members. ECF Nos. 39-4 at 105:11–106:16; 39-5 ¶¶ 15–16. Mr. Cavallaro acknowledged during his deposition that his new business operated in the same area as his The Cleaning Authority franchise territory and that he solicited and serviced the same customers. ECF No. 39-4 at 69:4–70:15, 73:12–74:25, 79:1–22, 101:8–15, 130:13–131:1. Mr. Cavallaro admitted that he had received the cease-and-desist letter. ECF No. 39-5 ¶ 9.

Viewing the evidence in the light most favorable to Mr. Cavallaro and construing all inferences in his favor, the undisputed material facts establish that as a matter of law Mr. Cavallaro breached the franchise agreement as alleged. *E.g.*, *JTH Tax, Inc.* v. *Lee*, 514 F. Supp. 2d 818, 823 (E.D. Va. 2007) (finding a breach of franchise agreement's covenant not to compete where the former franchisee, among other things, opened a new business in the same industry in the same location with the same phone number, used the franchise client files to solicit business, and invited former franchise clients to engage the services of the new business); *Choice Hotels Int'l, Inc.* v. *Madison Three, Inc.*, 83 F. Supp. 2d 602, 610 (D. Md. 2000) ("Since it is undisputed by the parties that [Defendant] ceased making franchise payments in November 1997, [Defendant] fell into breach and [Plaintiff] was within its rights to cancel the contract and sue on its terms.").

"Under Maryland law, . . . a plaintiff who proves breach of contract may recover (1) 'the losses proximately caused by the breach,' (2) 'that were reasonably foreseeable,' and (3) 'that have been proven with reasonable certainty.'" *Primoff* v. *Warfield*, 495 Fed. Appx. 293, 298 (4th Cir. 2012) (quoting *Hoang* v. *Hewitt Ave. Assocs., LLC*, 177 Md. App. 562, 594 (2007)). "Losses that are speculative, hypothetical, remote, or contingent either in eventuality or amount will not qualify as 'reasonably certain' and therefore [are not] recoverable." *Hoang*, 177 Md. App. at 595 (quoting *Stuart Kitchens, Inc.* v. *Stevens*, 248 Md. 71, 74-75 (1967)); *see also FZata Inc.* v. *Guan*, No. 1385, Sept. Term, 2021, 2023 WL 8053056, at *30 (Md. App. Ct. Nov. 21, 2023), *cert. denied*, 486 Md. 400 (2024). "Finally, the non-breaching party has a duty to mitigate damages," that is, "to make all reasonable efforts to minimize the loss [ ] sustain[ed] as a result of the breach." *Chaplick* v. *Mao*, Civil Action No. TDC-13-2070, 2016 WL 7106000, at *4 (D. Md. Dec. 5, 2016) (quoting *Sergeant Co.* v. *Pickett*, 285 Md. 186, 203 (1979)).

Here, as a result of Mr. Cavallaro's breach, The Cleaning Authority seeks compensatory damages, attorney's fees and costs, and injunctive relief. Certain aspects of The Cleaning Authority's request for relief are settled. For example, it is undisputed that by entering into the franchise agreement with The Cleaning Authority, Mr. Cavallaro agreed to be personally liable for any damages resulting from any breach of the franchise agreement. ECF No. 39-3 at 39. Mr. Cavallaro also agreed to pay for interest on late payments at a 1.5 percent rate, or "the highest legal rate for open account business credit in the state where the Franchised Business is located, whichever is less, until paid." *Id.* at 12. Pursuant to the terms of the franchise agreement, Mr. Cavallaro agreed that, should The Cleaning Authority prevail in any claim against him in court, he must pay reasonable attorney's fees and costs incurred in an action. *Id.* at 32.

Other aspects of The Cleaning Authority's requested relief, however, involve disputed and unestablished facts. For example, The Cleaning Authority asserts that it is entitled to

11

$15,488.13 in pre-termination damages. ECF. Nos. 39-1 at 15; 39-8 at 6–7. In support of this request, The Cleaning Authority relies only on its answers to interrogatories (ECF No. 39-8 at 6–7) and a spreadsheet (ECF No. 39-13) that is unsupported by a declaration or other competent evidence. This is an inadequate evidentiary basis upon which the Court can award any such damages. *E.g.*, *Cory* v. *Whisman, Grygiel & Giordano*, Civil Action No. WMN-06-02694, 2012 WL 13001305, at *8 (D. Md. Nov. 29, 2012) (finding a purported allocation of damages to be speculative because it lacked testimony interpreting the Internal Revenue Service printout). Moreover, it is far from clear that the calculations presented in the spreadsheet are accurate in light of the correspondence from Mr. Cavallaro via counsel that repeatedly questioned The Cleaning Authority's calculations. *See supra* p. 4.

   The Cleaning Authority further contends that it is entitled to post-termination damages in the form of lost future royalties through 2026, which it calculates as totaling $145,959.71. ECF Nos. 39-1 at 19–20; 43 at 4. This damage request also lacks evidentiary support. The Cleaning Authority relies solely upon its answer to an interrogatory (ECF No. 39-8 at 7), which provides little visibility into its mathematical calculations or the evidentiary foundation for such a calculus. To the extent The Cleaning Authority relies on Mr. Cavallaro's purported accounting of weekly sales (ECF No. 39-11), this spreadsheet is insufficient because it, too, is unsupported by a declaration or other competent evidence. *Cory*, 2012 WL 13001305, at *8. Moreover, the summary judgment filings cast no light on the issues of a potential double-recovery or The Cleaning Authority's duty to mitigate. *See, e.g.*, *Kiddie Acad. Domestic Franchising LLC* v. *Faith Enters. DC, LLC*, Civil Action No. WDQ-07-0705, 2010 WL 673112, at *5 (D. Md. Feb. 22, 2010) (observing that "courts have been hesitant to award future royalties under a multi-year franchise agreement when there is possible double-recovery, uncertainty in the existence and amount of future royalties, and inability to determine what portion of lost royalties were actually

lost profits and not costs attendant to maintaining the franchise relationship."). This forecloses any award of post-termination damages at this juncture.

Further, any award of attorney's fees and costs would be premature. Here, the undisputed facts establish that Mr. Cavallaro agreed in the franchise agreement to pay reasonable attorney's fees and costs incurred in any action in which The Cleaning Authority prevailed against him. "A contractual obligation to pay attorneys' fees generally is valid and enforceable . . . [a]bsent misconduct or fraud, overreaching, misrepresentation, or other grounds for voiding the contract." *Atlantic Contracting & Material Co., Inc.* v. *Ulico Cas. Co.*, 380 Md. 285, 316 (2004). Nevertheless, attorney's fees are "limited to reasonable fees and costs." *Bel Air Plaza Ltd. P'ship* v. *Ross Dress for Less, Inc.*, Civil Action No. CCB-14-2533, 2016 WL 3440191, at *1 (D. Md. June 23, 2016). To receive full attorney's fees and costs, The Cleaning Authority must offer "detailed records" supporting the reasonableness of the amounts based on "the services performed, by whom they were performed, the time expended thereon, and the hourly rates charged." *Id.* At the appropriate juncture, The Cleaning Authority may do so.

Finally, The Cleaning Authority seeks a permanent injunction to enforce the franchise agreement's noncompetition agreement. ECF No. 39-1 at 15. "Under Maryland law, the evaluation of non-compete clauses is fact specific." *Cleaning Auth., Inc.* v. *Neubert*, 739 F. Supp. 2d 807, 819 (D. Md. 2010). Issuance of a permanent injunction requires the Court to consider a host of factors, including the existence of a legally protected interest, the scope and duration of the covenant, any undue hardship, and the impact on public policy. *See*, *e.g.*, *Occupational Health Centers of the Sw., P.A.* v. *Toney*, Civil Action No. ELH-17-0975, 2017 WL 1546430, at *10-11 (D. Md. Apr. 28, 2017); *MCS Servs., Inc.* v. *Jones*, Civil Action No. WMN-10-1042, 2010 WL 3895380, at *3 (D. Md. Oct. 1, 2010). This inquiry involves assessment of a multitude of factors, many of which are disputed or unestablished on the present

record. Simply put, the undisputed material facts do not support an award of monetary damages, attorney's fees and costs, or injunctive relief in connection with the pending motion.

### 2. Mr. Cavallaro's Breach of Contract Counterclaim

Mr. Cavallaro argues that The Cleaning Authority initially and materially breached the franchise agreement, rendering the contract invalid, by failing to provide adequate advice and guidance. ECF No. 42 at 5; *see also* ECF No. 13 ¶¶ 159-166. Mr. Cavallaro cites Section 12.1 of the franchise agreement, which provides, in pertinent part, that "[The Cleaning Authority] will provide [Mr. Cavallaro] with reasonable operating assistance, as [The Cleaning Authority] determine[s] from time to time to be necessary for the operation of the Franchised Business." ECF Nos. 39-3 at 20, 42 at 5.

Here, there is no dispute that The Cleaning Authority provided operational support. Mr. Cavallaro's own exhibits establish that The Cleaning Authority gave feedback on specific hiring advertisements. ECF No. 42-1 at 3 (providing advice regarding the number of hours and hourly rate listed in a specific employment advertisement; referencing The Cleaning Authority's best practices; and suggesting an additional hiring platform); ECF No. 42-2 at 3 (providing suggestions on how to effectively use an online hiring platform, engage with prospective employees, and utilize virtual interviews). The Cleaning Authority also offered assistance with holiday brochures and customer reviews. *Id*. at 2.

While Mr. Cavallaro may have experienced difficulty hiring and retaining employees (*e.g.*, ECF Nos. 42-3 at 2; 42-4 at 2, 42-5 at 2), the franchise agreement did not require the "tailored advice and guidance" that Mr. Cavallaro perceived as a material breach (ECF No. 42 at 5). As noted, *see supra* II.B., Maryland law requires an objective evaluation of a contract, and where terms are unambiguous the Court must give them their plain meaning. Section 12.1 of the franchise agreement requires only *reasonable* operating assistance that *The Cleaning Authority*

14

*determines* to be necessary. ECF No. 39-3 at 20. Mr. Cavallaro's breach of contract claim therefore fails.

Even if The Cleaning Authority had materially breached the franchise agreement, any initial breach would not excuse Mr. Cavallaro from performing while simultaneously reaping the benefits of the agreement. *7-Eleven, Inc.* v. *McEvoy*, 300 F. Supp. 2d 352, 358 (D. Md. 2004). The available remedy to a franchisee after a franchisor's alleged breach is "to either sue for damages or to discontinue his acceptance of the benefits of the agreement *and then* discontinue his performance." *Prosperity Sys., Inc.* v. *Ali*, Civil Action No. CCB-10-2024, 2010 WL 5174939, at *3 (D. Md. Dec. 15, 2010) (emphasis in original) (citing *7-Eleven, Inc.*, 300 F. Supp. 2d at 358). Here, it is undisputed that Mr. Cavallaro failed to send a notice of default, identify a breach, or otherwise request termination of the franchise agreement. ECF No. 39-4 at 154:1–156:6. Instead, he continued to benefit from the franchise agreement while unilaterally deciding that he need not perform certain contractual obligations. For all of these reasons, the undisputed material facts establish that The Cleaning Authority is entitled to judgment as a matter of law on Mr. Cavallaro's breach of contract counterclaim.

### C.   Declaratory Judgment

Mr. Cavallaro's second counterclaim that seeks a declaratory judgment fails for the same reasons. While Mr. Cavallaro's responsive pleading asserts multiple bases for a declaratory judgment (ECF No. 13 ¶¶ 128–158), his summary judgment filings largely focus on the same arguments addressed above (ECF No. 42 at 10). Mr. Cavallaro argues that the franchise "agreement's purpose was frustrated and impossible to perform because, due to the actions of [The Cleaning Authority], [Mr. Cavallaro] could not recruit or retain employees." ECF No. 42 at 10. Mr. Cavallaro again contends that The Cleaning Authority's "inadequately tailored advice and guidance related to recruiting at [his] location led to the impossibility of fulfilling the

15

purpose of the agreement." *Id.*  For the reasons stated previously, this argument is unavailing.  Further, his attempts to reframe the purpose and terms of the franchise agreement (*see, e.g.*, *id.* at 11) gain no purchase because of Maryland's objective contract interpretation.  Further, it cannot be overlooked that the franchise agreement at issue in this case is the third such contract that Mr. Cavallaro and The Cleaning Authority had consummated.[4]  *See supra* p. 2.

Finally, Mr. Cavallaro argues that the franchise agreement's purpose was frustrated and that his performance was rendered impossible due to his inability to hire and retain employees following the COVID-19 pandemic.  ECF No. 42 at 12.  Maryland law provides that "where the purpose of a contract is completely frustrated and rendered impossible of performance by a supervening event or circumstance, the contract will be discharged."  *Montauk Corp.* v. *Seeds*, 215 Md. 491, 499 (1958).  In its analysis, the court considers "(1) whether the intervening act was reasonably foreseeable; (2) whether the act was an exercise of sovereign power; and (3) whether the parties were instrumental in bringing about the intervening event."  *Harford Cnty.* v. *Town of Bel Air*, 348 Md. 363, 384 (1998).

Both parties cite to Maryland cases addressing frustration of purpose and impossibility in the context of the COVID-19 pandemic.  ECF Nos. 42 at 13; 43 at 8–9.  One such case illustrates the challenge Mr. Cavallaro faces in advancing these defenses.  In *Critzos* v. *Marquis*, the Appellate Court of Maryland found that frustration of purpose and legal impossibility defenses did not apply to a restaurant-lessee who faced economic challenges during the COVID-19 pandemic.  256 Md. App. 684, 700-701 (2023).  Because the restaurant could still operate carry-

---

[4] This undisputed fact is also fatal to the other grounds for declaratory relief sought in his counterclaim—to the extent Mr. Cavallaro has not waived them by failing to argue them on summary judgment.  There is no credible basis on which a factfinder could conclude that the franchise agreement was unconscionable, against public policy, or the product of fraud given that Mr. Cavallaro had been a franchisee for more than twenty years and had entered into three separate franchise agreements with The Cleaning Authority.  *See supra* p. 2.

out or delivery services, *id.* at 701, performance was not "objectively impossible," *id.* at 693. Here, Mr. Cavallaro fails to show that operating his business was objectively impossible, whether it was because of the COVID-19 pandemic, "the reopening of cleaning services" and "employees' increasing demands" following "the COVID-19 lockdown," or The Cleaning Authority's "inadequately tailored advice and guidance related to recruiting."  ECF No. 42 at 10. Mr. Cavallaro may have faced staffing challenges, but there is no genuine issue of material fact that Mr. Cavallaro still had the minimum employees necessary to continue operating his franchise.  ECF Nos. 42-1; 42-4; 42-5; 42-9.  Indeed, it is undisputed that Mr. Cavallaro continued to operate his business and hired staff during and well past the pandemic.  *See, e.g.*, ECF Nos. 42-4; 42-8.

### III.    CONCLUSION

For the foregoing reasons, The Cleaning Authority's motion for summary judgment with respect to Counts I and II of the complaint and Mr. Cavallaro's counterclaims is granted in part and denied in part.  A separate Order follows.

Date: May 1, 2025                                            /s/
                                                             Erin Aslan
                                                             United States Magistrate Judge